# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **REBECCA DEL VALLE, RICKEY REID, and JEANNE BLAKENSHIP,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:03-1168** |
| | | **JUDGE TRAUGER** |
| **BELLSOUTH TELECOMMUNICATIONS, INC.** | ) ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendant BellSouth Telecommunications, Inc. (Docket No. 48), to which plaintiffs Rebecca Del Valle, Rickey Reid, and Jeanne Blakenship have responded (Docket No. 55), and BellSouth has replied (Docket No. 65). For the reasons stated herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND

The plaintiffs are three of several members of the Communications Workers of America, AFL-CIO ("CWA") who, in 1999, brought claims against the defendant, BellSouth Telecommunications, Inc., for age and sex discrimination in the United States District Court for the Northern District of Georgia.[1] (Docket No. 56, Plaintiff's Response to Defendant's

---

[1]Specifically, the lawsuit, which was filed as a class action, alleged that BellSouth engaged in gender and age discrimination in employment by failing to grant promotions and transfers to current and former BellSouth employees to the position of Electronic Technician ("ET"). (Docket No. 56, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶ 7) After the motion for class certification was denied, putative class members, including the plaintiffs, filed motions to intervene as individual plaintiffs. *Id*. at ¶ 8.

Statement of Undisputed Material Facts at ¶ 6)  At the time that the lawsuit was brought, the plaintiffs herein were no longer working for BellSouth.  *Id*. at ¶ 10.

A global settlement of the litigation was ultimately reached in mediation.  The settlement had a monetary component and, for certain claimants, a job instatement component.  *Id*. at ¶ 9. John Quinn served as the lead attorney for the CWA on the case, and he negotiated the settlement agreement with James R. Glenister, counsel for BellSouth.  *Id*. at ¶ 12.  The plaintiffs herein did not participate in the settlement negotiations.  *Id*. at ¶ 13.

On May 30, 2002, as a result of the global settlement of the litigation reached through mediation, BellSouth and the CWA entered into a Settlement Agreement and Full and Final Release of Claims (hereinafter the "Settlement Agreement.").  *Id*. at ¶ 18.  The Settlement Agreement required each claimant to sign an individual Full and Final Release of Claims.  *Id*. at ¶ 19.  As part of the settlement, BellSouth agreed to consider twenty-four of the individual claimants for ET positions, including the three plaintiffs in this case.[2]  *Id*. at ¶ 20.  The "terms and conditions" for considering the individual claimants for ET positions were provided for by an Addendum attached to the Release and incorporated therein by reference.  Plaintiff Reid signed his release on April 29, 2002, and plaintiffs Del Valle and Blakenship signed their releases on May 1, 2002.  *Id*. at ¶21.

The relevant language of the Settlement Agreement and the Individual Releases/Addendums concerning BellSouth's agreement to consider the twenty-four individuals for ET positions is as follows:

---

[2]At the time of the global settlement, these twenty-four claimants were either no longer employed by BellSouth or were employed by BellSouth in positions other than ET positions.  *Id*. at ¶ 20.

2

2.     For a period of one year from the date all conditions in Paragraph 5 of the Settlement Agreement are met, BellSouth will consider the above Claimants for ET vacancies within a 35 mile radius of the exchange listed for each Claimant. The Claimants will be deemed qualified pursuant to the terms of the Collective Bargaining Agreement and will be deemed to have a valid job bid on file. Claimants will be selected for ET positions when vacancies occur, consistent with the provisions of the Collective Bargaining Agreement. Those employees who are no longer BellSouth employees will be considered to have the level of seniority they held on the date when they left BellSouth's payroll.

*** 

4.     If it appears for whatever reason, that any of the above Claimants will not be offered an ET position in a vacancy by the end of the referenced 1-year period, BellSouth will create sufficient ET positions specifically for any such remaining Claimants as soon as it becomes apparent that there will be an insufficient number of vacancies. In no circumstances will the amount of time required to create such positions exceed 6 weeks following the expiration of the 1-year period. Such positions will be created over and above the vacancies which BellSouth would have created absent this Settlement Agreement, specifically as an equitable remedy in settlement of this action. Placement in such ET positions will not be subject to the verification process set forth in Paragraph 3 of this exhibit. If any BellSouth employee represented by CWA initiates a timely grievance with CWA asserting that such employee is entitled to a position created pursuant to this paragraph 4 or otherwise challenging such job creation, such grievance shall be subject to the grievance and arbitration procedures under Article 23 of the Collective Bargaining Agreement, subject to any modifications herein.

*Id*. at ¶23.[3] The parties agree that the conditions for determining the triggering date for the one-year ET job consideration period contained in Paragraph 2 above were met on June 19, 2002. *Id*. at ¶ 24. This meant that BellSouth had until June 19, 2003, to consider the plaintiffs for ET positions, as vacancies occurred. *Id*. at ¶ 25. If not enough vacancies occurred by June 19, 2003, BellSouth promised, pursuant to Paragraph 4 above, to create an ET position for each of the

_____

[3]The Addendums attached to the Individual Releases refer to these same paragraphs as paragraph numbers three and five. The contents within, however, are identical. (Docket No. 53, Attachment 5, Full and Final Release of Claims of Rebecca Del Valle and Addendum)

3

twenty-four claimants within six weeks, or by August 1, 2003. *Id*. at ¶ 28.

It is undisputed that all three of the plaintiffs were eventually rehired by BellSouth into ET positions. Blackenship was rehired and began working for BellSouth on October 14, 2002; Del Valle was formally offered employment as an ET by letter dated November 25, 2003 and began working for BellSouth on January 5, 2004; and Reid was formally offered an ET position on October 29, 2003 and began working on December 8, 2003. (*Id*. at ¶¶ 31, 46, 47, 52) Plaintiffs Del Valle and Reid, however, claim that BellSouth failed to rehire them within the terms set forth by the Settlement Agreement and Individual Releases, thereby breaching the agreement.[4]

It is undisputed that neither Del Valle nor Reid was hired into an ET position during the one-year period following the trigger date of the Settlement Agreement. However, according to James Glenister, the attorney for BellSouth who negotiated the global settlement, BellSouth considered them for the ET position during this time.[5] (Docket No. 58, Deposition of James Glenister, Esq., at p. 16; Docket No. 55, Plaintiff's Memorandum Supporting Denial of the Defendant's Motion for Summary Judgment at p. 3) Glenister also testified that, during this year, Del Valle was verbally offered, by Michelle Rizer-Pool, Staff Manager at BellSouth, an ET

---

[4]Because Blakenship was, pursuant to the global settlement of the litigation, rehired by BellSouth as an ET and began working on October 14, 2002, she does not bring such a claim. (*Id*. at ¶ 31; Docket No. 55, Plaintiff's Memorandum Supporting Denial of Summary Judgment at p. 2)

[5]Glenister explained that plaintiff Reid was not selected for an ET position during the one-year period because, for purposes of considering him for the arising vacancies, he was considered to have the level of seniority he had when he left BellSouth employment, and this level of seniority was lower than other employees. These employees, therefore, were selected for the position before him. (Glenister Dep. at p. 29)

4

position in a central office that was within the 35 mile radius of the exchange listed for her.  *Id*.

at pp. 18–19.  Michelle Rizer-Pool testified that the offer was made to Del Valle in June of 2002

but that Del Valle rejected it.  (Docket No. 59, Deposition of Michelle Rizer-Pool at p. 4)  Del

Valle denies receiving such an offer.  (Docket No. 63, Affidavit of Rebecca Del Valle, at ¶ 3)

John Quinn, counsel for the CWA, makes no mention of the June 2002 offer, but he does

state that:

> Prior to the expiration of the time period in the settlement agreement in which
> BellSouth had agreed to consider Ms. Del Valle for an ET position, I was
> contacted by Jim Glenister of BellSouth.  During this conversation, BellSouth
> offered Ms. Del Valle the option of being rehired and placed in the ET job as per
> the settlement, or a buy-out in recognition of the fact that she could be subject to
> layoff in the near future because of a downturn in the telecommunications
> industry which was not anticipated at the time of the settlement.

(Docket No. 51, Declaration of John L. Quinn, Esq., at ¶ 19)  Glenister confirmed that this

contact was made.  (Glenister Dep. at pp. 30, 31)  According to Quinn, he spoke with Del Valle

during the week of September 1, 2003, and, thereafter, he assisted her in negotiating a possible

buy-out in lieu of a job.[6]  (Quinn Decl. at ¶¶ 20, 21)  Quinn also states that, after Del Valle

retained Phillip Davidson to represent her instead, he sent Davidson, on September 9, 2003, a

letter outlining the history of the class action lawsuit and the terms of the Settlement Agreement.

*Id*. at ¶ 22.  Del Valle testified that Davidson subsequently engaged in negotiations with

BellSouth between September 9, 2003, and October 10, 2003.  (Docket No. 60, Deposition of

Rebecca Del Valle, at p. 100)  According to Del Valle, she was never offered an ET position by

---

[6]Quinn contends that, while engaged in negotiations, "BellSouth was always willing to
rehire Ms. Del Valle immediately into an ET position."  (Quinn Decl. at ¶ 21)

5

anyone at BellSouth prior to the time that Davidson began to negotiate with them.[7] (Del Valle Aff. at ¶ 3) Del Valle testified that she retained Davidson in August of 2003, after BellSouth "breached the agreement and didn't hire me back within a year time-frame and the six weeks." (Del Valle Dep. at pp. 98–99)

Plaintiff Reid also denies being offered an ET position before August 1, 2003. (Docket No. 62, Deposition of Rickey Reid, at p. 48) According to Glenister, however, during the six-week period following June 19, 2003, he contacted Reid's attorney, Julie Fosbinder, and verbally offered Reid an ET position. (Glenister Dep. at p. 32) Glenister also stated that he offered Fosbinder the option of negotiating a monetary payment in lieu of Reid's rehiring and that he subsequently engaged in verbal negotiations with her on the issue.[8] *Id*. at p. 33. Plaintiff Reid testified that it was not his intent to participate in a buyout settlement, but he admitted that he gave Fosbinder permission to bring a possible offer from BellSouth to him. (Reid Dep. at p. 52)

While only plaintiffs Reid and Del Valle assert that the defendant failed to rehire them within the appropriate time period pursuant to the Settlement Agreement, all three plaintiffs allege that BellSouth breached the terms of the Settlement Agreement and Individual Releases

---

[7]She does state, however, that, on September 11, 2003, after the negotiations had begun, Michelle Rizer-Pool verbally offered her an ET position over the phone. (Del Valle Dep. at pp. 117, 147)

[8]Fosbinder did not confirm or deny this testimony. Rather, by Affidavit dated April 22, 2005, Fosbinder states that, "[a]bsent consent by the parties or a subpoena, I am not willing to discuss further details of my discussions with Mr. Glennister and/or Quinn regarding placement of Mr. Reid in an ET Position because of the Confidentiality Provision of the Settlement Agreement in the case *C.W.A. Local 3603 et. al. v. BellSouth telecommunications, Inc*." (Docket No. 67, Affidavit of Julie Fosbinder at ¶ 3) Fosbinder did attach to her Affidavit a copy of a letter, written on November 11, 2003, and sent to Glennister, which states that "Mr. Reid wishes to be placed in the ET position, rather than make another offer to settle the placement issue.' (*Id*. at Exhibit 1)

by failing to hire them at the level of seniority they had on their last day of employment with BellSouth. (Docket No. 31, Amended Complaint, at ¶ 4.1) The plaintiffs contend that the last sentence of Paragraph 2 of the Settlement Agreement provides them with immediate "bridging" of their seniority upon rehire. As stated above, Paragraph 2 states that:

> For a period of one year from the date all conditions in Paragraph 5 of the Settlement Agreement are met, BellSouth will consider the above Claimants for ET vacancies within a 35 mile radius of the exchange listed for each Claimant. The Claimants will be deemed qualified pursuant to the terms of the Collective Bargaining Agreement and will be deemed to have a valid job bid on file. Claimants will be selected for ET positions when vacancies occur, consistent with the provisions of the Collective Bargaining Agreement. Those employees who are no longer BellSouth employees will be considered to have the level of seniority they held on the date when they left BellSouth's payroll.

The Collective Bargaining Agreement ("CBA"), to which the above paragraph refers, was entered into by BellSouth and the CWA on August 5, 2001. (Docket No. 56, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts at ¶¶ 1, 4) The CBA governs all terms and conditions of employment for BellSouth employees who are members of the bargaining unit represented by the CWA, including each of the plaintiffs in this lawsuit. *Id*. at ¶ 1. Section 1.26 of the CBA creates seniority rights for bargaining unit members. *Id*. at ¶ 2. Seniority is defined as the "length of continuous BellSouth service . . . accrued from the date an employee actually begins work if the employee has been continuously engaged or the service accrued in the case of an employee who has not been continuously engaged." *Id*. Seniority governs in all "matters relating to assignment of hours and vacations, layoffs, rehiring after layoffs, voluntary transfers, involuntary transfers and promotions." *Id*. at ¶ 3.

Seniority "bridging" rights are specifically created by Section 1.26B of the CBA, which states:

7

Bridging. When a former employee is rehired by the Company, he/she shall be given credit for the former service as follows:

> 1. When the break in service has been less than 6 calendar months, the former service shall be bridged immediately and the seniority date adjusted accordingly;

> 2. When the break in service has been 6 calendar months or more, the former service shall be bridged after 3 continuous years of service, and the seniority date adjusted accordingly.

*Id*. at ¶ 4.

It is undisputed that, when the plaintiffs were rehired, each of their respective breaks in service exceeded six months.[9] Their former service did not bridge immediately and the seniority date was not adjusted accordingly. On April 1, 2004, as a result of the anticipated surplus in the ET job title, Mr. Reid lost his ET job and transferred to a collections representative position . *Id*. at ¶ 60. For the same reason, BellSouth transferred Del Valle to a circuit layout assigner position on March 28, 2004 and laid her off on June 26, 2004. *Id*. at ¶ 61. Del Valle and Reid claim that they lost their jobs as Electronic Technicians because of their low level of seniority, as layoffs at BellSouth are selected in reverse seniority order. (Del Valle Dep. at pp. 130, 134, 179; Reid Dep. at p. 64; Amended Complaint at ¶¶ 3.6, 3.8) Blakenship claims that, as a result of her lack of seniority, she is being threatened with losing her job. (Amended Complaint at ¶ 3.9)

PROCEDURAL HISTORY

On December 8, 2003, plaintiff Del Valle brought suit in this court, grounding federal court jurisdiction in diversity and alleging breach of the Settlement Agreement and Release of

---

[9]Plaintiff Blakenship was originally hired by BellSouth on January 8, 1979, and was laid off on August 31, 1996. *Id*. at ¶¶ 29, 30. BellSouth first hired plaintiff Del Valle on March 14, 1977, and her employment was terminated on November 14, 1995. *Id*. at ¶¶ 37, 39. Plaintiff Reid was originally hired on February 8, 1981, and left employment with BellSouth on June 24, 1997. *Id*. at ¶¶ 40, 41.

8

Claims, intentional and oppressive conduct and negligent infliction of emotional distress. (Docket No. 1, Complaint)  The defendant filed a Motion to Dismiss on January 16, 2004, asserting that the plaintiff's claims were preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 1985, and that her case should be dismissed because she failed to exhaust her administrative remedies under the Collective Bargaining Agreement.  (Docket Nos. 6, 7)  By Memorandum and Order dated May 19, 2004, the court found that "all of the plaintiff's claims 'require interpretation of the terms of the collective bargaining agreement' and, therefore, are preempted by Section 301."  (Docket No. 16)  However, the court rejected the defendant's contention that a determination that the plaintiff's claims are preempted by Section 301 automatically means that they should be dismissed since the CBA requires resort to the CBA's grievance and arbitration procedure for all alleged breaches of agreement between members of the local union and the defendant.  *Id*. at pp. 4–5.  The court instead found that, because the Release of Claims specifically states that it may be enforced in court and does not incorporate the CBA grievance and arbitration provisions, the plaintiff was not required to file a grievance under the CBA for the alleged breach.  *Id*.  The court gave the plaintiff twenty days within which to file an Amended Complaint couching her claims under Section 301 of the LMRA.  *Id*. at p. 5.

On June 24, 2004, Del Valle filed her Amended Complaint as well as a Motion to Amend to add two additional plaintiffs, Rickey Reid and Jeanne Blakenship.  (Docket Nos. 18, 19)  The court granted the motion and, on June 22, 2004, the Amended Complaint adding Reid and Blakenship as additional plaintiffs was filed.  (Docket Nos. 30, 31)  Plaintiffs Del Valle and Reid allege that the defendant breached the Settlement Agreement by failing to hire them within the terms set by the Settlement Agreement and by failing to hire them at their former level of

seniority.  Plaintiff Blakenship claims only that the Settlement Agreement was breached because the defendant failed to hire her at her former level of seniority.  (Docket No. 31; Docket No. 55 at p. 2)

On March 15, 2005, BellSouth filed the pending Motion for Summary Judgment as to all three plaintiffs, claiming that: (1) the Section 301 claims of Reid and Blakenship are barred by the LMRA's six-month statute of limitations; (2) the court lacks jurisdiction to hear the plaintiffs' claims that BellSouth breached the CBA because the plaintiffs have failed to exhaust their administrative remedies under the CBA; (3) the Settlement Agreement, as a matter of law, does not require BellSouth to bridge the plaintiffs' seniority upon rehire; (4) plaintiffs Del Valle and Reid are estopped from asserting that BellSouth breached the Settlement Agreement by not placing them into ET positions by August 1, 2003, because BellSouth offered to hire Del Valle and Reid by August 1, 2003, and because the parties thereafter voluntarily engaged in further negotiations concerning monetary payments in lieu of rehire; and (5) to the extent that estoppel is not warranted, BellSouth did not breach the Settlement Agreement as a matter of law because it considered plaintiffs for ET positions within one year after all contingencies of the Settlement Agreement were met and created ET positions for Del Valle and Reid within the subsequent six week period, or by August 1, 2003.  (Docket Nos. 48, 49; Docket No. 65)

ANALYSIS

I.      <u>Summary Judgment Standard</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

10

that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P 56(c)*. To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed 2d 538, 106 S. Ct. 1348 (1986); *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174-75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The

11

nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co*., 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp*., 277 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

II.    Statute of Limitations for Section 301 Claims

The defendant's argument that the Section 301 claims brought by Reid and Blakenship are untimely because they failed to file suit within six months of learning that their seniority would not bridge is without merit because it rests on the mistaken presumption that Section 301 claims under the LMRA are automatically governed by the six-month statute of limitations contained in Section 10(b) of the National Labor Relations Act. While the Supreme Court, in *DelCostello v. Int'l Brotherhood of Teamsters*, held that the six-month statute of limitations

12

period for filing unfair labor practice charges under the National Labor Relations Act was the statute of limitations applicable to the employee's hybrid Section 301 claim against the employer and the union for breach of the collective bargaining agreement and breach of the duty of fair representation, the court emphasized that its holding "should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere." 462 U.S. 151, 171 (1983); *See also Reed v. United Transp. Union*, 488 U.S. 319, 324 (1989) (calling *DelCostello* a "closely circumscribed exception," which made clear that "application of a federal statute will be unusual, and resort to state law remains the norm for borrowing of limitations periods.") (internal quotations omitted). Rather, the Court held that a rule from elsewhere in federal law should be borrowed only where it "clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id*. at 172; *See also Cummings v. John Morrell & Co*., 36 F.3d 499, 504 (6th Cir. 1994). In finding the sixth-month federal statute of limitations from the NLRA applicable to the employee's hybrid claim under Section 301, the Court stressed the similarity between a hybrid suit and an unfair labor practice claim and found that, unlike a "straightforward breach of contract suit under §301," such a hybrid claim "has no close analogy in ordinary state law." *DelCostello*, 462 U.S. at 165.

The "straightforward breach of contract suit under §301" to which the Court specifically referred was the case of *UAW v. Hoosier Cardinal Corp*, 383 U.S. 696 (1966). In *Hoosier*, the Court faced the issue of which limitations period was applicable to a straight Section 301 claim brought by a union against an employer for an alleged failure to pay for vacations, as required by

a collective bargaining agreement. *Id.* The Court declined to impose a single federal statute of limitations for all actions brought under § 301 and, in holding the suit governed by Indiana's six-year limitations for actions on unwritten contracts, relied on the fact that the suit was "essentially an action for damages caused by an alleged breach of an employer's obligation embodied in a collective bargaining agreement," and that "[s]uch an action closely resembles an action for breach of contract cognizable at common law." *Id.* at 705 n. 7. *See also DelCastillo*, 462 U.S. at 162–63 (explaining that, in *Hoosier*, "we also relied heavily on the obvious and close analogy between this variety of § 301 suit and an ordinary breach of contract case.").

Here, the plaintiffs bring suit under Section 301 of the LMRA for damages caused by BellSouth's alleged breach of its obligations contained within the Settlement Agreement. (Docket No. 16) The Sixth Circuit has previously held that "actions based on breach of a collective bargaining agreement are governed, under Tennessee law, by Tenn. Code Ann. § 28-3-109 and its predecessors, which specify a six-year period of limitation." *Central States Southeast v. Kraftco*, 799 F.2d 1098, 1108 (6th Cir. 1986) While the instant case involves the alleged breach of a Settlement Agreement, rather than a collective bargaining agreement, the court finds the distinction irrelevant, as the case still closely resembles an action for common law breach of contract and was brought pursuant to Section 301 of the LMRA.[10] Thus, the court finds Tennessee's general six-year statute of limitations governing suits for breach of contract, Tenn. Code Ann. 28-3-109, likewise applicable and concludes that, because plaintiffs Reid and

---

[10]Because resolving the claim for breach of the Settlement Agreement requires interpretation of the terms of the Collective Bargaining Agreement, the court previously determined that state law claims for breach of the Settlement Agreement were preempted by Section 301. (Docket No. 16)

14

Blakenship filed suit within this appropriate six-year time frame, their claims are not precluded.

III.     Exhaustion

The defendant next argues for summary judgment on the grounds that the plaintiffs have

failed to exhaust their administrative remedies under the CBA.  As stated above, *supra p.9,* the

court has previously addressed, and rejected, this argument:

> The defendant maintains that a determination that the plaintiff's claims are
> preempted by Section 301 automatically means they should be dismissed because
> the CBA requires resort to the CBA's grievance and arbitration procedure for all
> alleged breaches of agreements between members of the local union and the
> defendant.  The court finds otherwise.  First, the CBA became effective August 5,
> 2001.  (Docket No. 8, attach. at 1) The Release was entered into on May 1, 2002
> in connection with the settlement of a federal discrimination case and specifically
> states that it may be enforced in court.  (Docket No. 1, attach., Release at ¶ 13)
> Although the Addendum attached to the Release incorporates certain provisions
> of the CBA with regard to the selection of the plaintiff for a position, the Release
> does not incorporate the grievance and arbitration provisions of the CBA.[FTN 1]
> Moreover, the Release states specifically that it "embodies the entire agreement of
> the parties relating to the subject matter hereof as it relates specifically to
> claimant.  No amendment or modification of the release shall be valid or binding
> on the parties unless made in writing and signed by the parties."  (*Id*. at ¶11) The
> Release does not require the plaintiff to file a grievance under the CBA for its
> breach.  If it did, ¶¶ 11 and 13 of the Release would be meaningless undertakings.

Docket No. 16 at pp. 4–5.[11]  Under the same rationale, this case presents no exhaustion issues

with respect to the additional plaintiffs, Reid and Blakenship.

IV.     Breach of Settlement Agreement

A. *Failure to Hire Within One-Year Period*

---

[11]The court took note, in Footnote 1, that the parties were in agreement that the reference
to the CBA's grievance and arbitration procedures contained in Paragraph 5 of the Addendum
attached to the Individual Release of plaintiff Del Valle, which is identical to Paragraph 4 of the
Addendum attached to the Settlement Agreement, applies only to other union employees who
might have been impacted by the creation of a new ET position for the plaintiff.  (Docket No. 16
at p. 5, n. 1)

Case 3:03-cv-01168   Document 69   Filed 07/14/05   Page 15 of 23 PageID #: 15

Plaintiffs Del Valle and Reid claim that the defendant's "failure to timely hire [them] within one year" constitutes a breach of the Settlement Agreement. It is undisputed that, as part of the global settlement, BellSouth agreed to consider twenty-four of the individual claimants, including the three plaintiffs in this case, for ET positions. (Docket No. 56 at ¶ 20) The Full and Final Release of Claims states that, for those claimants being considered for ET positions, "[t]he terms and conditions for such consideration are specified in detail in the attached Addendum hereto." *Id.*, Exhibit B at ¶ 3(c). The Addendum to the Release of Claims is titled the "Provision Regarding Placement in ET Job," and its stated purpose is to "provide[] for the terms and conditions of considering the following individual Claimants for Electronic Technician ("ET") positions."[12] (Docket No. 60, Del Valle Dep., Exhibit D at ¶ 1)

The Addendum expressly requires that: (1) "For a period of one year from the date all conditions in Paragraph 5 of the Settlement Agreement are met, BellSouth will consider the above Claimants for ET vacancies within a 35 mile radius of the exchange listed for each Claimant" (Paragraph 2); and that (2) "If it appears, for whatever reason, that any of the above Claimants will not be offered an ET position in a vacancy by the end of the referenced 1-year period, BellSouth will create sufficient ET positions specifically for any such remaining Claimants as soon as it becomes apparent that there will be an insufficient number of vacancies" (Paragraph 4). The plaintiff concedes that, if not enough vacancies occurred by June 19, 2003, BellSouth promised, pursuant to Paragraph 4, to create an ET position for each of the twenty-four claimants within six weeks, or by August 1, 2003. *Id.* at ¶ 28. The Agreement itself,

---

[12]The Addendum attached to each individual Release of Claims, and incorporated therein, contains the same title and language with regard to each individual Claimant. (Docket No. 56, Attach. 5)

therefore, provides for a scenario in which a claimant may not be offered a position within the first year. Thus, assuming plaintiffs Del Valle and Reid were not offered ET positions within the one year period defined in Paragraph 2 of the Addendum to the Settlement Agreement, BellSouth cannot, as a matter of law, be said to have breached the Agreement for failing to do so.

Rather, Paragraph 2 of the Addendum demands only that BellSouth *consider* Claimants for ET vacancies within the one-year period. The parties agree that the conditions for determining the triggering date for the one-year ET job consideration period contained in Paragraph 2 above were met on June 19, 2002, and that this meant that BellSouth had until June 19, 2003, to consider the plaintiffs for ET positions, as vacancies occurred. *Id*. at ¶¶ 24, 25. Glenister testified that BellSouth considered Del Valle and Reid for ET positions during this one-year period (Glenister Dep. at pp. 16, 28), and the plaintiffs have offered no evidence to dispute this contention. Based on the record before the court, no reasonable juror could find that BellSouth breached the Settlement Agreement by failing to consider plaintiffs Del Valle and Reid for ET positions prior to June 19, 2003.

B. *Failure to Timely Hire Within the Six Weeks Subsequent to the One-Year Period*

Plaintiffs Del Vale and Reid next assert that, because there is an issue of fact as to whether BellSouth offered them an ET position within the requisite six-week period, their claim that BellSouth breached the Settlement Agreement by failing to timely hire them by August 1, 2003, should survive summary judgment. The defendant counters that no such genuine issue exists because, while the plaintiffs may not have personally received an offer from BellSouth prior to August 1, 2003, it is undisputed that the attorneys representing them did and that, thereafter, the parties engaged in voluntary negotiations regarding a monetary payment in lieu of

17

rehire. According to the defendant, the plaintiffs are therefore estopped from asserting that a failure to place them in ET positions by August 1, 2003, constituted a breach of the Settlement Agreement.

With respect to plaintiff Del Valle, James Glenister testified that an ET position was created for Del Valle within the six-week period and that this was communicated to her attorney, Quinn. (Glenister Dep. at p. 30) Quinn verified that "prior to the expiration of the time period in the settlement agreement in which BellSouth had agreed to consider Ms. Del Valle for an ET position," Glenister contacted him and "offered Ms. Del Valle the option of being rehired and placed in the ET job as per the settlement." (Quinn Decl. at ¶ 19) According to Quinn, Glenister also offered "a buy-out in recognition of the fact that she could be subject to layoff in the near future because of a downturn in the telecommunications industry which was not anticipated at the time of the settlement." *Id*. Quinn stated that he then "assisted Ms. Del Valle in negotiating a possible buy-out in lieu of a job." *Id*. at ¶ 21.

Concerning Reid, Glenister also stated that he offered an ET position verbally to Reid's counsel, Julie Fosbinder, during the six-week period. (Glenister Dep. at p. 32) According to Glenister, he also offered Fosbinder the option of negotiating a monetary payment in lieu of rehiring as well and that they subsequently engaged in negotiations regarding a potential buy-out. *Id*. at p. 33. While Reid maintains that he did not personally receive an offer before August 1, 2003, he conceded that he gave Fosbinder permission to bring a possible buy-out offer from BellSouth to him. (Reid Dep. at p. 52) Under these sets of facts, there is no genuine issue of material fact as to whether the plaintiffs, *vis a vis* their attorneys, were offered ET positions prior to August 1, 2003. That the offer was presented to the plaintiffs' attorneys, rather than the

18

plaintiffs themselves, is irrelevant. *See, e.g.*, *Daniel v. Cantrell*, 241 F.Supp.2d 867, (E.D.T.N. 2003), ("The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal.") (citing *Veal v.* Geraci, 23 F.3d 727, 725 (2d Cir. 1994)), *aff'd*, 375 F.3d 377 (6th Cir. 2004).

Moreover, under the express terms of the Agreement, BellSouth was not required to either offer the position or to hire the plaintiffs within the six weeks following the expiration of the one-year period. The unambiguous language of the Agreement dictates only that "[i]n no circumstances will the amount of time required to create such positions exceed 6 weeks following the expiration of the 1-year period." Placement is another step in the process, as evidenced by the language of the Agreement itself, which states that "[p]lacement in such ET positions will not be subject to the verification process set forth in Paragraph 3 of this exhibit." Because there is no evidence in the record to dispute Glenister's contention that BellSouth created ET positions for Del Valle and Reid within the six-week period (Glenister Dep. at pp. 30, 34), no reasonable juror could find that the defendant breached the terms of the Settlement Agreement in this regard.

C. *Bridging of Seniority Rights*

Finally, the plaintiffs claim that BellSouth breached the Settlement Agreement by failing to hire them at the level of seniority they had upon leaving BellSouth. In support of this claim, the plaintiffs point to the last sentence contained in Paragraph 2 of the Addendum to the Settlement Agreement, which states that, "[t]hose employees who are no longer BellSouth Employees will be considered to have the level of seniority they held on the date when they left BellSouth's payroll." The plaintiffs admit that BellSouth was required to use the plaintiffs' old

19

seniority dates when it considered them for ET positions within the year following June 19, 2002, as vacancies arose, and that, if an employee more senior to them was entitled to an ET position within the one year, then that person got the job over the plaintiffs.  (Docket No. 55 at p. 6)  However, the plaintiffs claim that the last sentence in Paragraph 2 also provides that, "when they did go back to work, at whatever date, they did so with the seniority they held on the date they left the payroll of BellSouth."  Id.  In other words, the plaintiffs assert that the Settlement Agreement required BellSouth to immediately bridge their seniority upon rehire, in contradiction to the express language of Section 1.26B of the CBA, which requires that employees rehired "when the break in service has been 6 calendar months or more," work for three continuous years before they are credited with their former seniority.  (Docket No. 56 at ¶ 4)

The unambiguous language of the Settlement Agreement, however, does not require BellSouth to bridge the plaintiffs' seniority upon rehire.  To so conclude would require that the last sentence of Paragraph 2 be considered in isolation and without regard for the context in which it arose.  Such a reading would be inconsistent with traditional rules of contractual interpretation requiring the court to "interpret each provision in question as part of the integrated whole."  *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983)  As the Sixth Circuit has stated, while the enforcement and interpretation of agreements under Section 301 is governed by substantive federal law, "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies."  *Id.*  The *Yard-Man* Court, in interpreting a collective bargaining agreement under Section 301, held that, "many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent" and that, as a result, courts should first look to the explicit language of the agreement for clear

20

manifestations of intent. *Id.* The Court noted, however, that "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." *Id.*

It is undisputed that the Settlement Agreement contains a job instatement component for certain claimants, including the plaintiffs. (Docket No. 56 at ¶ 9) The Addendum to the Settlement Agreement, titled the "Provision Regarding Placement in ET Job," "provides for the terms and conditions of considering the following individual Claimants for Electronic Technician ("ET") positions."[13] (Docket No. 60, Del Valle Dep., Exhibit D at ¶ 1) Pursuant to the Addendum, the job instatement component of the Settlement Agreement required BellSouth: (1) to consider, for one year, the twenty-four claimants for ET positions as vacancies occurred, consistent with the provisions of the CBA; and (2) if not enough ET positions became available during the one-year period, to create ET positions within six weeks, or by August 1, 2003, for the remaining claimants.

When the Addendum is read as a whole, in its entirety, it is clear that Paragraph 2 governs only the first requirement– that BellSouth consider the claimants for vacancies as they arise for a one-year period following the satisfaction of certain conditions precedent. After establishing this duty, Paragraph 2 then explains the process by which this consideration is to take place. Paragraph 2 first explains that "Claimants will be selected for ET positions when vacancies occur, consistent with the provisions of the Collective Bargaining Agreement" and, directly thereafter, states that "[t]hose employees who are no longer BellSouth employees will be

---

[13]The Addendum attached to each individual Release of Claims, and incorporated therein, contains the same title and language with regard to each individual Claimant. (Docket No. 56, Attach. 5)

considered to have the level of seniority they held on the date when they left BellSouth's payroll."  It is undisputed that, under the CBA, seniority governs in all "matters relating to ... rehiring after layoffs," among other things.  (Docket No. 56 at ¶ 3)   It is also undisputed that, at the time the Settlement Agreement was entered into, several of the twenty-four claimants who were to be considered for instatement, including the plaintiffs, were no longer employees of BellSouth and, thus, had no level of seniority.

When viewed in conjunction with the requirement of the Addendum that the selection of claimants for ET positions as vacancies occur remain consistent with the provisions of the CBA and the requirement of the CBA that seniority governs in all matters relating to rehiring, the last sentence of Paragraph 2 can only be read as establishing the seniority of the claimants no longer employed by BellSouth for the sole purpose of determining the order in which they were to be selected for ET positions as vacancies occurred during the one-year period.   The Settlement Agreement, by its unambiguous terms, does not confer automatic "bridging" rights upon the plaintiffs that would be in violation of the CBA.[14]  Thus, the plaintiffs' argument that BellSouth

---

[14]Even if the language of the Settlement Agreement were ambiguous, extrinsic evidence revealing the intent of the drafters would support the court's interpretation.  John Quinn, the CWA attorney who negotiated the Agreement on behalf of the plaintiffs, stated that:

> The negotiated settlement did not call for immediate bridging of seniority and was never intended to do so.  Immediate bridging of seniority would have violated the seniority rights of incumbent employees and would have resulted in their filing grievances and possibly charging CWA with a breach of its duty of fair representation....  It was never the intention of this [last] sentence [of Paragraph 2] to provide these individuals with immediate bridging rights.  The parties never intended to circumvent or modify the express terms of the CBA.  Rather, because 24 plaintiffs were to be considered for ET jobs as part of the settlement agreement, the purpose of this sentence was to determine in which order BellSouth would consider the 24 plaintiffs for ET positions as vacancies occurred during the first year after the settlement agreement was entered into.

(Quinn Decl. at ¶¶ 13, 24)  Likewise, James Glenister, the BellSouth attorney who negotiated the

breached the Agreement by failing to rehire them at the level of seniority they had on their last date of employment cannot survive summary judgment.

<u>CONCLUSION</u>

For the foregoing reasons, the Motion for Summary Judgment filed by defendant BellSouth, will be granted.

An appropriate order will issue.

                                      _____
                                      ALETA A. TRAUGER
                                      United States District Judge

---

Settlement Agreement on behalf of BellSouth, stated, under oath, that, "[t]he Settlement Agreement does not modify or amend Article 1.26 of the CBA and does not require that Plaintiff's seniority be bridged upon rehire." (Docket No. 53, Attach. 27 at ¶ 5)

23